**BARBARA S. MABRA,**

        **Plaintiff,**

                                **Civil Action 2:11-cv-00407**
**vs.**                                    **Judge Edmund A. Sargus**
                                    **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL**
**SECURITY,**

        **Defendant.**

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

      Plaintiff, Barbara S. Mabra, brings this action seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits.  Plaintiff alleges that she has been disabled since September 29, 2004, due to degenerative disc disease, diabetes, and high blood pressure.  (R. at 50, 57.)

      After  administrative denials of her claim, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ") on November 18, 2008.  (R. at 204–45.)  A vocational expert also testified at the hearing.  (*Id.*)  On March 20, 2009, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. at 13–22.)  This decision became the final decision of the Commissioner on March 11, 2011 when the Appeals Council denied review.  (R. at 3–5.)

      Plaintiff thereafter timely commenced this civil action.  In her Statement of Errors, Plaintiff's contends, in part, that the ALJ erred in discounting her credibility; failed to properly

weigh the opinion evidence of her treating physician; erred in concluding that she was capable of performing her past work; and improperly relied on her own lay opinion. Following the Commissioner's Memorandum in Opposition, this matter is now ripe for review. For the following reasons it is **RECOMMENDED** that the Court **REMAND** this case to the Commissioner for further consideration.

## II.  PLAINTIFF'S TESTIMONY

Plaintiff, who was fifty eight years old at the time of the administrative hearing, has a GED and one year of business college. Her past relevant work was as a tool crib attendant and a quality control technician. (R. at 212–13.)

At the administrative hearing, Plaintiff testified that she stopped working in September 2004 because she was unable to do her job after hurting her back, and her employer was not able to accommodate her restrictions. (R. at 214, 229.) Plaintiff suggested, however, that if she could have returned to her past position as a quality control technician, and perform the work in the same manner, she would have been able to do so at the time she stopped working. (R. at 215.) Plaintiff also indicated that she looked for work in the summer of 2005. (R. at 211.)

Plaintiff stated that her worst problem was her back condition. (R. at 216.) She testified to having back pain since 2002, but indicated that the pain had become worse over time. (R. at 216–18.) Plaintiff reported that her back pain is constant and often goes down both of her legs. (R. at 216.) Plaintiff estimated that on an average day her pain was an eight on a ten point scale. (R. at 217.) On the day of the hearing, she measured her pain at nine. (*Id.*) Plaintiff testified that she received medication for her condition, but that her doctor had not recommended surgery nor had she seen a specialist. (R. at 218.) Plaintiff had last received an MRI in January 2007,

although she indicated this was because her insurance would not cover an additional MRI. (R. at 219.) At the time of the hearing, Plaintiff had been using a cane for the past six months. (*Id.*) Plaintiff testified that her other conditions, diabetes and hypertension, were well controlled. (R. at 220.)

Plaintiff estimated that she could stand in one place for 15 to 20 minutes. (R. at 217.) She stated that she walks for 30 minutes every other day. (R. at 218, 227.) She felt that she could lift approximately ten pounds comfortably. (R. at 218.) Plaintiff testified that she lies down for 15 minute periods to relieve her pain. (R. at 217.) She reported that she lies down approximately three times a day. (R. at 230.) Plaintiff originally stated that she could sit an hour or an hour and a half without having a problem. (R. at 218.) She later testified, however, that she could only sit for about 30 to 45 minutes before needing to get up to relieve pain. (R. at 230.) She also indicated that her pain forces her to lose concentration on tasks. (R. at 231.)

In terms of daily activities, Plaintiff testified that she takes care of her personal grooming and hygiene except she cannot bend down to tie her shoes. (R. at 221–22.) She reported doing some household chores including making her bed, preparing meals, laundry, and dusting. (R. at 22.) Plaintiff stated that she drives about twice a day, normally to the store and to visit family. (R. at 209.) She indicated that she has to make short trips to the grocery store rather than getting everything at once. (R. at 223.) Plaintiff reported going out to visit family members approximately once a week. (R. at 225–26.)

### III. MEDICAL RECORDS

Plaintiff underwent an MRI of the lumbar spine on July 19, 2002. (R. at 88.) The MRI findings included a diffuse annular bulge at L5-S1; central disc protrusion at L4-5; and diffuse

annular disc bulge at L3-4.  (*Id.*)  The overall impression was "[m]ultilevel degenerative changes, a component of central canal and lateral recess stenosis most severe at L4-5 where there is also a central disc protrusion."  (*Id.*)

Plaintiff began treating with Thomas Brunsman, M.D., at Jamestown Family Medicine, Inc., at least as early as July 29, 2002.  (R. at 191.)  At this time, Plaintiff reported that she had injured her back at work on the first day of July.  (*Id.*)  Following review of Plaintiff's July 2002 MRI, Dr. Brunsman prescribed pain medication.  (*Id.*)  In June 2003, Plaintiff reported to Dr. Brunsman that she was having trouble meeting the lifting requirements of her job, which required her to lift greater than fifty pounds.  (R. at 188.)  At this time Dr. Brunsman diagnosed Plaintiff with chronic lumbar strain and degenerative joint disease of the lumbar spine.  (*Id.*)  In October 2003, Dr. Brunsman noted pain and tenderness in Plaintiff's lumbar region upon examination as well as mild paraspinal muscle tenderness.  (R. at 187.)  In January 2004, Plaintiff was performing full duties at work, but was sometimes having her coworkers help her with lifting.  (R. at 186.)  Dr. Brunsman once again noted tenderness upon examination and continued prescribing Plaintiff medication for the pain.  (*Id.*)

In addition to Dr. Brunsman, Plaintiff also received treatment from Frank Klamet, M.D., beginning in October 2003.  (R. at 99.)  Upon initial examination, Plaintiff reported that her diabetes was well controlled.  (*Id.*)  Dr. Klamet, however, indicated that reviewing her past examinations Plaintiff's diabetes was uncontrolled.  (*Id.*)  Following physical examination, Dr. Klamet noted that "[back] pain is elicited with straight leg test bilaterally but is kind of vague." (R. at 100.)  Dr. Klamet diagnosed Plaintiff with insulin dependent diabetes, hypertension, and hyperlipidemia.  (*Id.*)  In May 2004, Dr. Klamet noted that Plaintiff's lab results were not great,

but that her blood pressure was much better. (R. at 98.) In June 2004, Plaintiff's gait and station appeared normal. (R. at 96.) On September 1, 2004, Dr. Klamet noted that Plaintiff's diabetes was still poorly controlled, but that her blood pressure was under excellent control. (R. at 94.)

On August 9, 2004, Plaintiff underwent a second MRI of the lumbar spine. (R. at 89.) Testing results included small left paracentral disc protrusion at the T11-12 level; small foraminal disc protrusion at the T12-L1 level; a shallow circumferential disc bulge and degenerative changes of the facet joints at the L3-4 level; and mild disc degeneration at the L4-5 level. (R. at 89.) Maurice Miller, M.D., who interpreted the test results, found "[c]entral canal stenosis of a mild degree at the L3-4 and L4-5 levels." (R. at 90.) Dr. Miller also noted that Plaintiff "appears to have short pedioles on a developmental/congenital basis." (*Id.*) Finally, Dr. Miller reported that "[d]isc bulging and facet changes contribute to the central canal stenosis and lateral recess stenosis." (*Id.*)

Plaintiff received treatment from Dr. Brunsman throughout 2004. (R. at 177–84.) In August 2004, Dr. Brunsman noted that Plaintiff's back pain was traveling down her leg and recorded positive straight leg testing upon examination. (R. at 184.) On September 28, 2004, Dr. Brunsman assigned a lifting restriction of twenty to twenty-five pounds. (R. at 183.) In October 2004, Dr. Brunsman opined that Plaintiff could return to work with no heavy lifting, assigning a twenty to twenty-five pound limit. (R. at 181.) Nevertheless, in November 2004, Dr. Brunsman noted that Plaintiff's lumbar strain and degenerative joint disease had "resulted in her inability to work," although Plaintiff reported "feeling much better" on pain medication. (R. at 179.) December 2004 treatment notes appear to reflect a decreased range of motion in Plaintiff's back. (R. at 177.)

The record also contains Dr. Brunsman's treatment notes from 2005 and 2006. (R. at 159–77.) Examinations, apparently performed in this period, included findings of back tenderness, positive straight leg raising, and decreased range of motion.[1] (*See, e.g.*, R. at 162, 168, 170, 172, 174, 176.) Additional treatment notes suggest that Plaintiff was having trouble walking and getting up. (R. at 168.) Dr. Brunsman consistently prescribed Plaintiff medication for her pain, including Vicodin. (R. at 159–77.) In April 2006, Dr. Brunsman prescribed Plaintiff a cane. (R. at 159.)

At the request of the state agency, William D. Padmadan, M.D., performed a consultive examination of Plaintiff on February 15, 2006. (R. at 108–16.) At the time of this examination Plaintiff was not limping, displayed a normal gait, and showed no clinical signs of distress. (R. at 109–10.) Examination revealed generally normal findings as to Plaintiff's neck and extremities. (*Id.*) Following an examination of Plaintiff's spine and back, Dr. Padmadan noted straight leg raising results of 30 degrees in supine position and 80 degrees in sitting position. (R. at 110.) Dr. Padmadan felt that "[f]lexion at the hip on standing was inappropriately decreased, not reliable." (*Id.*) X-rays of Plaintiff's lumbar spine taken at this time yielded normal results. (R. at 116.) Dr. Padmadan diagnosed low back pain without signs of radiculopathy, hypertension, and type II diabetes. (R. at 110.) Ultimately, he concluded that Plaintiff's "upper extremity functions for reaching, handling, fine, and gross movements were intact." (*Id.*) Dr. Padmadan opined, however, that "[b]ased upon this clinical evaluation, [Plaintiff] may need restrictions for isometric exercises such as lifting, pushing, and pulling, because of her hypertension more than her back." (R. at 110–11.)

---

[1] Many of the treatment notes during this period lack specific dates.

Dr. Brunsman completed an undated form describing Plaintiff's conditions and abilities sometime around August 2006.[2]  (R. at 139–40.)  On this form, Dr. Brunsman's diagnosed Plaintiff with degenerative disc disease, osteoarthritis of the lumbar spine, lumbar spinal stenosis, hypertension exacerbated by chronic pain, and chronic lumbar pain radiating into the right leg.  (R. at 139.)  Dr. Brunsman relied on clinical findings, including severe pain with straight leg raising, as well as the 2002 and 2004 MRI for support.  (*Id.*)  Dr. Brunsman noted that Plaintiff could not afford some medication, but otherwise had complied with his recommendations.  (R. at 140.)  In terms of limitations, Dr. Brunsman opined that Plaintiff was "unable to lift, stand prolonged periods of time, sit prolonged periods of time[, and] cannot stoop, bend or squat."  (R. at 140.)

Dr. Padmadan re-examined Plaintiff on September 5, 2006 because an MRI showed degenerative changes.[3]  (R. at 117.)  Dr. Padmadan noted that Plaintiff had "lot[s] of subjective complaints," as well as "inappropriate moaning and groaning."  (R. at 117–18.)  Upon examination of Plaintiff's extremities, Dr. Padmadan recorded "unusually low grip strength without any clinical findings of abnormalities."  (R. at 119.)  Dr. Padmadan found no changes since her February 2006 examination that would explain her drop in muscle power.  (*Id.*) With regard to Plaintiff's spine and back, Dr. Padmadan noted straight leg raising results of 15 degrees in supine position and 70 degrees in sitting position.  (*Id.*)  Dr. Padmadan further reported

_____

[2]  Although Dr. Brunsman did not date this document it is time-stamped August 7, 2006.

[3]  From Dr. Padmadan's evaluation it is unclear whether he had access to these MRI results.  His report states "[a]pparently, MRI showed degenerative changes."  (R. at 117.)  Dr. Padmadan, however, does not otherwise indicate how Plaintiff's MRI results influenced his opinions and findings.

multiple Waddell's signs,[4] including, "bending of the knees and hips on supine position exacerbated her pain . . ." (*Id.*) When attempting to walk on her heels, Plaintiff had a near fall, and indicated that she did not want to undergo further examination due to her pain. (*Id.*) Dr. Padmadan diagnosed back pain with Waddell's signs and type II diabetes. (*Id.*) He concluded that "[b]ased upon this clinical evaluation and in the presence of multiple Waddell's signs, I am not able to come up with any specific recommendation for restrictions." (R. at 120.)

On December 30, 2006, Plaintiff underwent a third MRI.[5] (R. at 192.) This MRI's results included shallow posterior disc protrusion at the T11–12 levels; slight posterior disc protrusion at L3-4, slightly encroaching upon the ventral dural sac, with moderate to advanced arthropathy; and shallow posterior disc protrusion at the L4-5 level. (*Id.*) The ultimate impression of Jane M. Burk, M.D., who interpreted the MRI, was "L4-5 shallow posterior disc protrusion with annular rent and right eccentricity; gently encroaching upon right ventral dural sac." (*Id.*) Dr. Burk also found a nominal posterior disc bulge with slightly small spinal canal at L3-4. (*Id.*)

Plaintiff received further treatment from Dr. Brunsman from late 2006 until at least September 2008. (R. at 125–49.) Dr. Brunsman routinely found back tenderness upon examination during this period. (*See* e.g. R. at 131,137,145.) Dr. Brunsman continued to

---

[4] "Waddell's signs are a group of physical signs that may indicate a non-organic or psychological component to chronic low back pain." *Hurt v. Astrue*, No. 1:10–cv–353, 2011 WL 3682776, at *6 n.2 (S.D. Ohio June 20, 2011) (citing Gordon Waddell, John McCulloch, Ed Kummel, Robert Venner, *Nonorganic Physical Signs in Low Back Pain*, Spine, March/April 1980, at 117–12).

[5] The results of the MRI were recorded on January 2, 2007. This MRI appears to be the testing to which the ALJ specifically referred during the administrative hearing. (*See* R. at 219.)

prescribe medication for Plaintiff's pain. (R. at 125–49.)

In 2008, Dr. Brunsman offered opinions regarding Plaintiff's impairments and abilities on a number of occasions. On September 3, 2008, Dr. Brunsman wrote a letter stating that Plaintiff "has been unable to work since September 2004" and in his opinion was permanently disabled. (R. at 141.) Dr. Brunsman further opined that Plaintiff's "chronic back pain limit[s] her ability to lift, bend, twist and stand for prolonged periods of time." (*Id.*) Dr. Brunsman indicated that Plaintiff's condition has gradually worsened over time. (*Id.*)

On September 9, 2008, Dr. Brunsman completed a functional capacity form. (R. at 150–51.) Dr. Brunsman opined that Plaintiff could lift and carry up to ten pounds frequently and eleven to twenty-four pounds occasionally. (R. at 150.) According to Dr. Brunsman, Plaintiff was capable of occasionally pushing/pulling and reaching above her shoulders, but could never be expected to bend, squat, crawl, or climb. (*Id.*) Dr. Brunsman felt Plaintiff could sit for 2 hours continuously and a total of 6 hours in a workday with rest; stand and/or walk for 1 hour continuously and 2 hours in a workday with rest; and alternatively sit/stand for 6 hours continuously or 8 hours in a workday with rest. (*Id.*) Ultimately, based on these and other restrictions he listed on the form, Dr. Brunsman concluded that Plaintiff had a moderate limitation of functional capacity and was capable of sedentary work activity. (R. at 151.)

Dr. Brunsman completed a second functional capacity form on September 16, 2008. (R. at 152–53.) Although many of Dr. Brunsman's answers were the same as his previous answers on the September 8, 2008 form, others differed. For example, Dr. Brunsman at this time indicated Plaintiff was only capable of sitting for 4 hours in a workday; standing and or walking for 2 hours in a workday; and alternatively sitting or standing for 4 hours in a workday. (R. at

152.)  Dr. Brunsman once again found Plaintiff capable of sedentary work activity.  (R. at 153.)

Dr. Brunman provided a third physical capacity evaluation, although this time on a different form, in November 2008.  (R. at 154–55.)  On this occasion, Dr. Brunsman concluded that Plaintiff could stand 1 hour in a workday, walk 1 hour in a workday and sit for 2 hours total in a workday.  (R. at 154.)  Dr. Brunsman indicated Plaintiff could occasionally carry eleven to twenty pounds and could frequently carry less than ten pounds.  (*Id.*)  Dr. Brunsman opined that Plaintiff could not use her hand repetitively for pushing and pulling and was unable to use her feet for repetitive movements such as operating controls.  (R. at 155.)  According to Dr. Brunsman, Plaintiff could occasionally climb stairs or ladders, but could not bend, kneel, squat, or crawl.  (*Id.*)

Finally, on November 6, 2008, Dr. Brunsman completed a form regarding Plaintiff's disorders of the spine.  (R. at 156.)  Dr. Brunsman submitted that Plaintiff had spinal stenosis, osteoarthritis, degenerative disc disease, and facet arthritis.  (R. at 156.)  Additionally, Dr. Brunsman provided that Plaintiff's lumbar spinal stenosis manifested with both chronic nonradicular pain and weakness.  (*Id.*)  Dr. Brunsman felt it was unknown whether Plaintiff could perform various activities such as walking a block at a reasonable pace on an uneven surface.  (R. at 157.)

## IV. EXPERT TESTIMONY

Steven Rosenthal testified at the administrative hearing as a vocational expert.  After asking Plaintiff a few questions regarding her past work, Mr. Rosenthal classified Plaintiff's past work as tool crib attendant, a medium exertional level position, and quality control technician, a light exertional position.  (R. at 235.)  Mr. Rosenthal stated, however, that from Plaintiff's

testimony it appeared that she had performed her quality control position at the sedentary level. (R. at 236.)

Mr. Rosenthal testified that if Plaintiff was capable of medium work she would be able to perform both of her past jobs. (*Id.*) If Plaintiff was able to only occasionally bend, Mr. Rosenthal still felt that she could perform her past quality control position. (*Id.*) The ALJ also asked Mr. Rosenthal to consider whether Plaintiff could perform her past work if she was limited to light work, could only occasionally bend, could not sit for more than 30 minutes at a time, and could not stand for more than 30 minutes at a time. (R. at 236.) After some clarification as to how Plaintiff performed her past work, Mr. Rosenthal concluded that Plaintiff would not be capable of her past tool crib position, but could perform her past quality control work. (R. at 236–38.)

Mr. Rosenthal further testified that, if Plaintiff was limited in the manner suggested that Dr. Brunsman's September 9, 2008 and September 16, 2008 functional capacity forms suggested, she would still be able to perform her past work as a quality control technician. (R. at 241.) Mr. Rosenthal indicated, however, that if a person was limited to the extent outlined in Dr. Brunsman's November 3, 2008 physical capacity evaluation she would be unable to perform substantially gainful employment. (R. at 240–41.) Finally, Mr. Rosenthal indicated that if Plaintiff was assumed to be entirely credible she would be incapable of work. (R. at 241–42.)

## V. ADMINISTRATIVE DECISION

The ALJ found Plaintiff was not disabled within the meaning of the Social Security Act in her March 20, 2009 decision. The ALJ concluded that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2009. (R. at 15.) At the first step

of the sequential evaluation process,[6] the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 29, 2004, her alleged disability onset date.  (*Id.*)

Upon review of the medical records, the ALJ determined that Plaintiff has the severe impairments of degenerative changes of the lumbar spine, type II diabetes mellitus, and hypertension.  (R. at 15–16.)  The ALJ then found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1.  ( R. at 69.)

At step four of the sequential process, the ALJ evaluated Plaintiff's residual functional capacity ("RFC").  The ALJ concluded that Plaintiff could perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c).  (R. at 17.)  In reaching this decision the ALJ noted that Dr. Brunsman gave multiple opinions regarding Plaintiff's functioning.  (R. at 18.)  The ALJ, however, chose not to accept, or give any great weight to these opinions for various reasons

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence.  *See* 20 C.F.R. §404.1520(a)(4).  Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?
2. Does the claimant suffer from one or more severe impairments?
3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?
4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?
5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

including the inconsistencies between Dr. Brunsman's functional capacity opinions. (R. at 18.) The ALJ also indicated that she did not give the opinions of Dr. Padamadan great weight due to their inconclusive nature. (R. at 18–19.) Finally, the ALJ found Plaintiff's subjective complaints to be not entirely credible. (R. at 20–21.)

Based on the above RFC and Mr. Rosenthal's testimony, the ALJ concluded that Plaintiff could perform her past relevant work as both a tool crib attendant and quality control tester.

## VI. STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the [Commissioner's] decision, this Court defers to that finding 'even if there

is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the Commissioner's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VII. LEGAL ANALYSIS

As noted above, Plaintiff challenges the ALJ's decision on a number of grounds. Plaintiff's contentions include that the ALJ erred in weighing the medical evidence, that substantial evidence does not support the ALJ's RFC assessment, and that the ALJ improperly relied on her own lay opinion and interpretation of the medical evidence. Upon review, the undersigned agrees that substantial evidence does not support the ALJ's RFC determination because the ALJ improperly relied on her own medical judgment. The undersigned further concludes that under the circumstances of this case, remand is appropriate.

### A. Opinion Evidence and Residual Functional Capacity

The ALJ must consider, and weigh, all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(c). Certain types of opinions, however, are normally entitled to greater weight. *See id.* For example, an ALJ must give the opinions of a treating physician controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with other substantial evidence in [the claimant's] case record . . . ." 20 C.F.R. § 404.1527(c)(2). Even assuming that a treating

physician opinion is not entitled to controlling weight, an ALJ must still consider the amount of weight that is appropriate by applying the relevant factors. *Id.* Furthermore, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] [the claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2).

Importantly, in weighing the medical evidence, "'ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.'" *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 194 (6th Cir. 2009) (quoting *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996)). Accordingly, "an ALJ may not substitute his [or her] own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence." *Id.* (internal quotations omitted); *see also Bledsoe v. Comm'r of Social Sec.*, No. 1:09cv564, 2011 WL 549861, at *7 (S.D. Ohio Feb. 8, 2011) ("An ALJ is not permitted to substitute her own medical judgment for that of a treating physician and may not make her own independent medical findings.") In other terms, "[w]hile an ALJ is free to resolve issues of credibility as to lay testimony, or to choose between properly submitted medical opinions, the ALJ cannot substitute his [or her] own lay 'medical' opinion for that of a treating or examining doctor." *Beck v. Comm'r of Soc. Sec.*, No. 1:10–cv–398, 2011 WL 3584468, at *14 (S.D. Ohio June 9, 2011) (Report & Recommendation later adopted).

Finally, the ALJ reserves the right to decide certain issues, such as a claimant's RFC. 20 C.F.R. § 404.1527(d). Nevertheless, in assessing a claimant's RFC, an ALJ must consider all relevant record evidence, including medical source opinions on the severity of a claimant's impairments. *See* 20 C.F.R. §§ 404.1527(d), 404.1545(a). Furthermore, this Court has stressed the importance of medical opinions to support a claimant's RFC, and cautioned ALJs against

relying on their own expertise in drawing RFC conclusions from raw medical data. *See Isaacs v. Astrue*, No. 1:08-CV-00828, 2009 WL 3672060, at *10 (S.D. Ohio Nov. 4, 2009) ("The residual functional capacity opinions of treating physicians, consultative physicians, and medical experts who testify at hearings are crucial to determining a claimant's RFC because '[i]n making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms.'") (quoting *Deskin v. Comm'r Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008)); *see also Nguyen v. Chater*, 172 F.3d 31, 35 (1st Cir. 1999) ("As a lay person, however, the ALJ was simply not qualified to interpret raw medical data in functional terms and no medical opinion supported the [RFC] determination."); *Paar v. Astrue*, No. 09 C 5169, 2012 WL 123596, at *13 (N.D. Ill. Jan. 17, 2012) (remanding where an "ALJ created his own RFC based on his assumptions of what [the plaintiff] could do").

In this case, as detailed above, the ALJ found Plaintiff retained the RFC to perform a full range of medium work.[7]  The record in this case, however, does not contain a single opinion from any medical source that indicates Plaintiff is functionally capable of performing medium work.  In reaching this finding, the ALJ specifically stated that "[t]he record does not contain evidence of abnormal clinical and laboratory findings sufficient to document any further degree of loss of function."  (R. at 17.)  She also acknowledged that MRIs demonstrated some degenerative changes, but she did not find these results "of such severity as would be expected to result in radiculopathy."  (*Id.*)  The ALJ further suggested that she was giving Plaintiff the benefit of the doubt in precluding heavy work given "the relatively minimal clinical and

---

[7]  The Regulations define medium work as work that "involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. § 404.1567(c).

diagnostic findings." (R. at 17.)  In reaching this determination, the ALJ did not accept, or give

any great weight, to Dr. Brunsman's functional capacity opinions, which provided severer

limitations.  The ALJ found Dr. Brunsman's opinions to be inconsistent with the medical

evidence, and noted that if Plaitniff's back condition was as severe as Dr. Brunman indicated,

"he would have been expected to have referred her to a specialist for further evaluation or for

more tests such as electromyography." (R. at 18.)  The ALJ also did not give any great weight to

Dr. Padamadan's inconclusive opinions, and found Plaintiff to be not entirely credible.

Upon review, the undersigned finds that substantial evidence does not support the ALJ's

RFC determination.  Although the ALJ may have been justified in finding Plaintiff to be less

than fully credible,[8] the RFC assessment still must adequately account for the objective medical

evidence.  The record in this case contains three different MRIs indicating that Plaintiff has at

least some level of degenerative changes in her back.  Specific findings of these MRIs included

stenosis, disc protrusion, disc bulging, facet changes, and moderate to advanced arthropathy. (R.

at 88–90, 192.)  Additionally, Dr. Brunsman's treatment notes consistently included findings of

tenderness as well as positive straight leg test results upon examination. (*See, e.g.*, R. at 131,

162, 174.)

In reaching her RFC determination, the ALJ accounted for this medical evidence by

relying on her own lay interpretation.  Tellingly, the ALJ did not credit any medical opinion

evidence in reaching her RFC assessment, as she gave no great weight to the all of the medical

---

[8] For reasons described further below, the undersigned finds that substantial evidence does not support the ALJ's RFC assignment and that remand is necessary.  Accordingly, the undersigned will refrain from addressing all of Plaintiff's contentions of error, including whether the ALJ properly assessed Plaintiff's credibility.  On remand, the ALJ is free to reconsider such issues.

source opinions within the record. Rather, the ALJ based her RFC assessment on her own medical conclusion that the MRI results and other evidence would only justify limiting Plaintiff to medium exertional work.

Although Plaintiff's MRI results may appear minimal to the lay person, the ALJ was not qualified to translate this medical data into functional capacity determinations. *See Roso v. Comm'r of Soc. Sec.*, No. 5:09CV198, 2010 WL 1254831, at *8 (N.D. Ohio Mar. 11, 2010) ("[T]he ALJ is simply not qualified to interpret the raw medical data in these MRI reports and no medical opinion in the record supports the ALJ's determination.") (internal quotation and citation omitted); *cf. also Meadors v. Astrue*, 370 F. App'x 179, 183 (2nd Cir. 2010) (holding that, although MRI results showed only mild degenerative changes of a claimant's lumbar spine "the ALJ was not at liberty to substitute his own lay interpretation of that diagnostic test for the uncontradicted testimony of [the treating physician], who is more qualified and better suited to opine as to the test's medical significance."). One federal court within this circuit has even gone as far as to set forth the following analysis, and general rule, under similar circumstances:

> Critical to this residual functional capacity finding are residual capacity opinions offered by medical sources such as treating physicians, consultative examining physicians, medical experts who testify at hearings before the ALJ, and state agency physicians who reviewed the claimant's medical records. In making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms. The District Judge in *Rohrberg v. Apfel* appropriately explained the limitations on the ALJ's ability to interpret medical data and the importance of medical opinions regarding capabilities and limitations to the residual functional capacity finding:
>
> > An ALJ is not qualified to assess a claimant's RFC on the basis of bare medical findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment is not supported by substantial evidence. Where the "medical findings in the record merely diagnose [the] claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such

18

as those set out in 20 C.F.R. § 404.1567(a) ... [the Commissioner may not] make the connection himself."

\* \* \*

To be sure "where the medical evidence shows relatively little physical impairment, an ALJ permissibly can render a commonsense judgment about functional capacity even without a physician's assessment." A functional capacity opinion from a medical source may not be necessary in every case. But, as Judge Richard Posner of the Seventh Circuit warned in *Schmidt v. Sullivan*, "[t]he medical expertise of the Social Security Administration is reflected in regulations; it is not the birthright of lawyers who apply them. Common sense can mislead; lay intuitions about medical phenomenon are often wrong." When a claimant has sufficiently placed his or her functional inability at issue, "the ALJ must measure the claimant's capabilities, and to make that measurement, an expert's RFC evaluation is ordinarily essential. . . ."

As a general rule, where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations . . . to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing. This responsibility can be satisfied without such opinion only in a limited number of cases where the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Deskin* 605 F. Supp. 2d at 911–12 (footnotes and citation omitted).[9]

Accordingly, the ALJ impermissibly relied on her own interpretation of the raw medical data. Furthermore, the ALJ substituted her interpretation in place of the opinions of Dr. Brunsman, the only medical source to offer detailed evaluations of Plaintiff's functional capacity.[10] Under these circumstances, the ALJ's RFC determination lacks support. Because the

---

[9] As the court in *Deskin* recognized, there are likely times when the medical evidence is so clear, that an ALJ would be justified in drawing functional capacity conclusions from such evidence without the assistance of a medical source. The medical evidence in this case, however, does not naturally lead to a commonsense conclusion that Plaintiff is capable of performing medium work, especially in the presence of contradictory treating-source opinions.

[10] The undersigned will not reach a decision at this time regarding whether Dr. Brunsman's opinions were entitled to controlling weight under the treating physician rule.

ALJ relied on this determination to ultimately conclude that Plaintiff could perform her past work, remand is necessary.

## B.    Nature of Remand

If substantial evidence does not support the Commissioner's decision, the Court must decide the nature of remand. The Court has the discretion to enter "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The United States Court of Appeals for the Sixth Circuit has emphasized that "[i]f a court determines that substantial evidence does not support the Secretary's decision, the court can reverse the decision and immediately award benefits only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

In this case, the undersigned finds that remand for further consideration is appropriate.[11] Because the ALJ did not base her RFC determination on acceptable grounds, substantial evidence is currently lacking in this case. While the current record does not adequately support the ALJ's

---

Although the ALJ does appear to have relied partially on her own interpretation of the medical evidence to reject Dr. Brunsman's opinions, she also provided other reasons for rejecting his opinions including their internal inconsistency. Furthermore, the vocational expert's testimony suggests that Dr. Brunsman's opinions lead to different disability conclusions depending on which opinion is considered.

[11]  In her briefing, Plaintiff posits that the ALJ should have re-contacted Dr. Brunsman for clarification regarding his opinions and should have sought out a medical expert for the administrative hearing. *See* 20 C.F.R. § 404.1512(d)-(e) (outlining the Commissioner's duty to develop the record and the process for obtaining additional evidence from medical sources). The undersigned will leave to the Commissioner's discretion the appropriate course of action, pursuant to the Regulations, upon remand.

determinations, this does not necessarily mean that the ALJ will ultimately prove incorrect. *Cf.*

*Brewer v. Astrue*, No. 1:10–cv–01224, 2011 WL 2461341, at *6 (N.D. Ohio June 17, 2011)

("Although the ALJ's assumption appears reasonable to a lay person and might ultimately be

correct, he has no special expertise to make such an assumption.").  Accordingly, the undersigned

is unwilling to conclude that all essential factual issues have been resolved at this time.

## VIII.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the Court **REMAND** the decision

of the Commissioner for further consideration.

## IX.  NOTICE

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:   June 19, 2012                                    _____/s/ *Elizabeth A. Preston Deavers*_____
                                                        Elizabeth A. Preston Deavers
                                                        United States Magistrate Judge